## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

**MARY YOLANDA TRIGIANI,**

       **Plaintiff,**

**v.**                                    **Case No._____**

**NEW PEOPLES BANK, INC.,**             **JURY TRIAL DEMAND**

**Serve:**
       **John J. Boczar,**
       **Registered Agent**
       **67 Commerce Drive**
       **Honaker, VA 24260-0000**

       **Defendant.**

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Mary Yolanda Trigiani ("Ms. Trigiani" or "Plaintiff"), by counsel, and states as her Complaint against Defendant New Peoples Bank, Inc. ("NPB" or "Defendant"), the following:

### I. JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter as it arises from the federal questions presented by Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and as codified under 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 through 634 ("ADEA"). *See generally* 28 U.S.C. § 1331; 28 U.S.C. §1343(a)(4).

2.    The venue is appropriate as the acts and/or omissions of Defendant from which the causes of action arise occurred within the Western District of Virginia. *See* 28 U.S.C. § 1391(b)(2).

3.      Due to its contacts within the Commonwealth of Virginia, Defendant avails itself of the jurisdiction of this Court.

4.      Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 3, 2020. Plaintiff received a Dismissal and Notice of Rights from the EEOC dated October 7, 2020, attached hereto as **EXHIBIT A**.  Plaintiff files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.

## II. THE PARTIES

5.      Plaintiff, a resident of Abingdon, Virginia, and currently 63 years of age,[1] is female and, at all times relevant to this Complaint, was an "employee" of NPB.

6.      Defendant NPB is a state chartered commercial bank that operates in the Commonwealth of Virginia and elsewhere.

7.      At all times relevant to this Complaint, NPB is and was a "person" within the meaning of Title VII, Section 701, 42 U.S.C. §2000e(a), an "employer" within the meaning of both Title VII, Section 701, 42 U.S.C. §2000e(b) and the ADEA, and engaged in an industry affecting commerce which had 15 or more employees for each working day in each of twenty or more calendar weeks during the year of Plaintiff's termination, or the preceding calendar year.

## III. FACTUAL ALLEGATIONS

8.      Prior to her employment with NPB, Ms. Trigiani owned and operated a successful consulting business for nearly thirty (30) years.

9.      Ms. Trigiani had developed many significant professional relationships

---

[1] Ms. Trigiani's exact date of birth is not included due to privacy concerns, and due to filing requirements as per the United States District Court Western District of Virginia Local Rules.

around the world and is considered a high-value executive in her field.

10.     After advising NPB on a consulting basis, NPB asked Ms. Trigiani to consider joining the bank's management team.

11.     A new role was created specifically for Ms. Trigiani, and she began working for NPB on or about July 31, 2017, as Senior Vice President of Strategic Planning and Development.

12.     Ms. Trigiani had been informed that her knowledge base, skills, experience, contacts, and reputation were all factors in NPB's decision to hire her. She was paid a salary, provided additional benefits, given check signing authority, and publicly presented as a management employee of NPB.

13.     Ms. Trigiani was advised that a significant part of her role would be to represent the bank at various functions and meetings.

14.     Ms. Trigiani initially began working at NPB's Bristol, Virginia location.

### The NPB Cult:
### NPB espoused and enforced conservative Christian evangelical beliefs, and openly favored employees who adhered to these beliefs, all to the detriment of its non-evangelical female employees

15.     Shortly after her hire, Ms. Trigiani noticed many disturbing trends in the office culture of NPB.

16.     NPB President and CEO, C. Todd Asbury, at all times relevant, was a pastor of a Christian Evangelical Pentecostal church.

17.     Mr. Asbury frequently made it known at NPB that he was a pastor first and CEO and President of NPB, second.  Upon information and belief, Mr. Asbury's church believes religious tenets including:

- the inerrancy of the Bible;
- the necessity of accepting Jesus as your Lord and Savior; and

- that women are required to act in a subordinate manner to men and that consuming alcohol is sinful, among other things.

18.     As detailed *infra*, Mr. Asbury, saw himself not just as a bank president, but as its spiritual leader. He encouraged a cult-like office culture by opposing individualistic thinking/ideas, penalizing or ostracizing employees who did not follow to the letter the certain cultural-religious tenets (such as the subjugation of women), expecting a slavish devotion to the NPB Cult, avoiding what he considered to be worldly/contemporary activities, and rewarding blind allegiance.

19.     Mr. Asbury regularly hired new employees directly from his congregation or those holding similar religious beliefs, including many younger men who identified as pastors, most of whom lacked business or banking qualifications.

20.     Mr. Asbury regularly stated to Ms. Trigiani and others that NPB was "uniquely blessed" and "experiencing miracles."

21.     Employees of NPB who espoused evangelical cultural positions were favored at NPB, while employees, like Ms. Trigiani, who maintain non-evangelical religious beliefs, were ultimately disfavored by NPB.

22.     Women who did not voice their opinions and who gave favor to the opinions of male employees simply because they were male, as was the "proper Christian way," were favored and encouraged by NPB.

23.     Conversely, women who possessed opinions and vocally articulated their opinions in a professional manner, such as Ms. Trigiani, were marginalized, isolated, intimidated, and disfavored due to a discriminatory animus against both non-evangelical employees and women.

24.     Ms. Trigiani soon recognized the office NPB culture for what it was:  a

religious-based group which requires its followers to submit themselves entirely to its leaders/teachings and which uses manipulative techniques to persuade and control its members.  In other words, the "NPB Cult".

### Office Pet to Office Threat:
### Ms. Trigiani received unwarranted criticism for not following
### NPB's arbitrary and subjectively applied "Golden Rule" mantra

25.     While Ms. Trigiani was initially wooed and perceived as an influential contributor to NPB, she soon transitioned from office pet to an office threat.

26.     As an example, Mr. Asbury and numerous NPB employees directed Ms. Trigiani and others to follow "the Golden Rule."

27.     Indeed, "Banking by the Golden Rule" is a marketing slogan utilized by NPB and, as of the date of the filing of this Complaint, is displayed prominently on the NPB website:



28.     "The Golden Rule," as defined by Mr. Asbury and employees of NPB, was a tenet of treating others as described in the book of Leviticus within the Bible.

29.     While Ms. Trigiani found value in the use of the "Golden Rule" in general, NPB's use of the mantra and the application as a human resources practice were inappropriate, as she observed that a supposedly secular for-profit business was enforcing Christian evangelical doctrine in the workplace, with no room for interpretation.

30.     Early in her employment with NPB, Ms. Trigiani complained about NPB's usage of "the Golden Rule" in this fashion.

31.     Ms. Trigiani indicated that the term was being used against her in response to legitimate professional decisions and feedback that she was imparting during the course of the workday.

32.     For example, if a bank employee did not agree with Ms. Trigiani's use of her professional authority, the employee would complain that Ms. Trigiani had failed to follow "the Golden Rule."

33.     Ms. Trigiani ultimately realized that her complaint about the use of "the Golden Rule" thereafter created a schism between Ms. Trigiani and those around her, including Mr. Asbury.

34.     As another example, Ms. Trigiani openly shared her professional opinions and information she believed relevant, just as a male employee might do in the same situation.

35.     However, due to the discriminatory animus against non-evangelical Christian women at NPB, Mr. Asbury made repeated comments beginning just two months after Ms. Trigiani's hire and persisting throughout her employment, that Ms. Trigiani had to "change the way" she "talked to people."  Mr. Asbury was attempting to

force Ms. Trigiani's assimilation into the NPB Cult and strongly suggest that she communicate in a meek and subordinate manner to male employees.

36.     Indeed, Mr. Asbury explained that despite her management-level position, Ms. Trigiani spoke with too much authority and she needed to be "respectful" in her tone.

37.     Upon information and belief, these comments were discriminatory, and they were direct references to her sex, age, and non-evangelical religious beliefs.

38.     Throughout her employment with NPB, Ms. Trigiani was consistently respectful and professional in her tone, which was the typical tone and usage expected in a general business practice.

39.     However, unlike the women in the workplace who followed the tenets of Mr. Asbury's religion, Ms. Trigiani, while always professional, did not speak in a way that was subordinate to male employees, nor did she give male employees' opinions greater weight simply because they were male.  In addition, on numerous occasions, Ms. Trigiani was required to repeat herself to employees who pushed back against her responsibility and authority.

40.     The culture at NPB disfavored intelligent and assertive female employees such as Ms. Trigiani. Rather, the culture only valued women if they behaved in a meek and subordinate manner that fell consistently within the bounds of acceptable female Christian evangelical behavior.

**Due to her age, gender, and/or religion, Ms. Trigiani was consistently undermined, and unfairly criticized by her male, evangelical supervisors**

41.     Throughout her employment, co-workers who proscribed to the evangelical religious beliefs favored by NPB worked to undermine and marginalize Ms. Trigiani by leaving her out of key meetings and providing her with discriminatory gendered feedback.

7

42.     Indeed, another Senior Vice President, Richard Smith, also a pastor of a Christian evangelical church, frequently shared unwarranted criticisms of Ms. Trigiani's decisions to others, in front of Ms. Trigiani and privately.  Mr. Smith also consistently ignored or downplayed Ms. Trigiani's opinions and contributions in group meetings.

43.     Upon information and belief, because of his role as a pastor, Mr. Smith's opinions were consistently held in higher regard by Mr. Asbury and others than those of Ms. Trigiani, regardless of merit, simply because he was male and a Christian pastor.

44.     When Mr. Smith became aware that Ms. Trigiani did not follow the traditional behaviors in accordance with the practices and culture of NPB, he complained to NPB leadership about Ms. Trigiani.  Indeed, supervisory employee Mr. Keys reported to Ms. Trigiani that Mr. Smith and his supervisor, Chief Retail Officer Andy Mullins, were constantly "whispering in Mr. Asbury's ear" about Ms. Trigiani.

45.     Mr. Smith also openly criticized the decisions and opinions of Ms. Trigiani even in areas that were within Ms. Trigiani's area of expertise (such as strategy, marketing, and communication) and not within his own areas of expertise (retail banking).

46.     Moreover, Mr. Smith was held in higher regard and received favorable treatment from NPB leadership due to his oppositional stance against Ms. Trigiani and his work to undermine her work performance.

47.     In fact, evangelical religious beliefs were so intertwined within the day-to-day operations of NPB, that it affected daily business decisions.

48.     As an example, Mr. Asbury indicated to Ms. Trigiani in early 2019 that NPB would begin to refuse to grant loans to businesses that NPB observed to engage in business that violated evangelical tenets, such as those that sold alcohol or leased space

to other businesses that sold alcohol.

49.     In July of 2019, Ms. Trigiani was approached by a customer of the bank, who complained that he had been told he would no longer qualify for loans at the bank if he rented to businesses that sold alcohol. The longer Ms. Trigiani worked at NPB, the more these religious practices and restrictions increased.

50.     As another example, in 2018, Ms. Trigiani was tasked by Mr. Asbury with reviewing the overdraft protection program (OOPs) that customer service representatives were asked to promote to customers.  This area reported to the CFO, John Boczar, but Mr. Asbury tasked Ms. Trigiani with reviewing the program and making recommendations for improvement. Ms. Trigiani worked with the staff person who managed the program and directed her with analyzing the results and the forward potential of the program, drafting a set of recommendations for overcoming the reluctance of employees to offer the service to customers, and crafting a presentation to management.   Ms. Trigiani's peers on the management team not only did not acknowledge her role in developing the analysis and recommendations, the executives responsible for design and delivery - Andy Mullins and John Boczar – irrationally refused to institute Ms. Trigiani's recommendations.

51.     As another example, after Ms. Trigiani was given a supervisory role of the marketing function of NPB, Ms. Trigiani consulted with area retail managers to devise a process for ensuring all branches carried consistent branch signage and messages.  It became apparent that individual branch employees were refusing to follow direction on the branch signage content solely because Ms. Trigiani was directing the message/in a supervisory role.   The pushback and unsupported complaints to Ms. Trigiani's supervisors were constant and disruptive to Ms. Trigiani's daily activities and to the

bank's ability to maintain a professional image. NPB did nothing to support Ms. Trigiani or to stop the underlying unprofessional behavior towards her.

52.     As another example, Ms. Trigiani was regularly subject to insubordination and disrespect by a particular subordinate branch employee, who is male and younger than Ms. Trigiani. This employee's actions were regularly in direct conflict with the employee handbook, and he was required to move into various positions within the organization due to several instances of performance issues. Even so, this employee who exhibited such poor work performance was favored as he held himself out as a lower level "pastor" and he vocally espoused the evangelical beliefs held dear by NPB. Instead of supporting Ms. Trigiani and/or disciplining or terminating this younger male employee, he was given deference.

### Mr. Asbury disparaged Ms. Trigiani, demanded that she "start behaving", and asked other NPB employees to report on her workplace conduct – all without legitimate reason

53.     In early 2018, without legitimate reason and, as one might speak to a child, Mr. Asbury scolded Ms. Trigiani and informed her that she had not been "behaving", and that she needed "to start behaving." His action was highly demeaning and sexually discriminatory.

54.     Mr. Asbury further indicated that he had asked other employees to "watch" Ms. Trigiani's actions during the day and to "report" back to him.

55.     These criticisms continued from Mr. Asbury throughout Ms. Trigiani's employment with NPB.

56.     At times, frustrated by the pressure to adopt a subservient demeanor, Ms. Trigiani would ask Mr. Asbury, "what is it that I'm doing?" Ms. Trigiani asked this question to seek justification from Mr. Asbury for his discriminatory conduct.

57.     Mr. Asbury would retort bluntly and in a malevolent tone with a corresponding facial expression, "you know what you're doing."

58.     Despite the pushback she received for being a woman and for not ostentatiously supporting evangelical principles, Ms. Trigiani excelled at her work and met all the legitimate business expectations of her employer.

### Ms. Trigiani's supervisors and peers continued to treat her poorly, excluded her from management-level meetings, ignored her requests for workplace meetings, and refused to involve her in relevant staffing decisions

59.     When CFO John Boczar was hired in early 2018, Ms. Trigiani attempted to secure his guidance and support in reviewing spending.

60.     Instead, Mr. Boczar dismissed her requests for meetings and conversations.

61.     When Ms. Trigiani informed Mr. Asbury that she was having difficulty completing some of her tasks as a result of her inability to get budget information from Mr. Boczar, Mr. Asbury made excuses for Mr. Boczar on grounds that "he had his hands full."

62.     In early November 2018, Mr. Boczar canceled a meeting between Ms. Trigiani and another employee on his team, without telling Ms. Trigiani.

63.     When Ms. Trigiani inquired about this situation, Mr. Boczar excoriated and berated her publicly, in a hallway, in front of the employee and others for calling the meeting, and then questioned Ms. Trigiani's judgment and role.  Notably, Mr. Boczar was not disciplined or counseled due to this unprofessional behavior.

64.     Around February of 2018, Mr. Asbury directed Ms. Trigiani to hire an assistant.

65.     Ms. Trigiani, as part of her position as the strategic planning lead and as a

member of the leadership team, was cognizant from management discussions in which she participated from 2017 and onward, of the fact that the bank needed and intended to reduce the employee headcount.  Indeed, Ms. Trigiani regularly received queries from bank shareholders as to the health of the bank and when they would receive dividends.

66.     Due to this, Ms. Trigiani was sensitive to the perception of hiring a new employee from outside of the bank and advocated to transfer a current employee who had banking experience.

67.     With Mr. Asbury's approval, Ms. Trigiani secured the names of three internal candidates to potentially transfer into the role of her assistant.

68.     When Ms. Trigiani proposed these candidates, Mr. Asbury rejected them.

69.     Mr. Asbury then directed Ms. Trigiani to instead interview an unqualified female who attended Mr. Asbury's church.

70.     This female parishioner was the only individual interviewed for the position, as the job was not posted for solicitation, and was hired, despite her complete lack of business experience.

71.     In subsequent months, it became clear that this individual was one of several persons Mr. Asbury had asked to "watch" Ms. Trigiani and report back on her "behavior".

72.     In the Autumn of 2018 and in early 2019, while still holding the title of Senior Vice President of Strategic Planning and Development, Ms. Trigiani began to notice that meetings and conversations about subjects relevant to her area of responsibility were being held without her participation.  These topics included strategy, staffing, marketing, and philanthropy decisions. As one example, when Ms. Trigiani attempted to begin work on the annual report content six months in advance of

publication, which is standard professional communications practice, Mr. Boczar refused to meet with her and indicated that he was handling the project.  However, Mr. Asbury later directed Ms. Trigiani to complete the annual report very close to the deadline.  Again, Mr. Boczar was not counseled or disciplined for his refusal to communicate or work with Ms. Trigiani in a timely manner or his failure to complete an important work project.

73.     After Ms. Trigiani was assigned to report to Mr. Keys in early 2019, she was inexplicably no longer invited to attend senior management weekly meetings or board meetings, even though her attendance would have been relevant and helpful to her job duties.

**Ms. Trigiani's role was expanded, but she was denied a pay raise that was ultimately provided to a similarly situated evangelical male employee**

74.     In May of 2018, Ms. Trigiani's role with the bank was expanded and announced to the entirety of NPB.  Ms. Trigiani's additional role included marketing duties, strategic planning, government relations, and philanthropy obligations, but she received no promotional title change, nor any increase in pay.

75.     At or around the same time, the male executive who had been responsible for marketing and was considered to be less than effective in the role – but who *did* proscribe to the evangelical beliefs of NPB – was awarded with both a title change and an increase in pay.

76.     Ms. Trigiani was part of the team crafting his job description and suggested that a promotion to senior vice president was too much at the time, but her observations were ignored.

77.     Ms. Trigiani felt this decision was discriminatory but did not express this, for fear of retaliation.

78.     However, Ms. Trigiani continued to follow up with Mr. Asbury about the need to discuss her title and compensation.

79.     Ms. Trigiani was consistently rebuffed until late December 2018, when Mr. Asbury requested that she place in writing her thoughts on the direction of her role at NPB.

80.     She suggested two options – returning to her original role without an increase in compensation or expanding her title, compensation, and staff headcount.

81.     Mr. Asbury refused either option offered by Ms. Trigiani, and instead escalated the hostility and personal attacks upon her in the workplace.

### Mr. Asbury threatened Ms. Trigiani's employment
### over a baseless third-party allegation of impropriety

82.     In January of 2019, a third party contacted Mr. Asbury and informed him that Ms. Trigiani was doing a disservice to the bank's reputation and asked Mr. Asbury to intervene.

83.     The third party had indicated in text messages to Ms. Trigiani and her landlord that Ms. Trigiani had over-indulged in alcohol, which was not a truthful statement.

84.     The abeyance from alcohol consumption, particularly by females, is a tenet of Mr. Asbury's evangelical beliefs.

85.     This third party requested that Mr. Asbury approach Ms. Trigiani and ask her to attend a meeting with the third party and their mutual landlord.

86.     Mr. Asbury confronted Ms. Trigiani with this information, and he indicated that he felt Ms. Trigiani should meet with them.

87.     Mr. Asbury further stated that, because of the complaint, from a man he

"knew had done good in the community," it was time for Ms. Trigiani "to go."

88.     Ms. Trigiani believed that she was being punished for a baseless allegation that: (1) did not affect the bank; (2) was not, if true, illegal or even against NPB policy; (3) reflected matters of her private life, not her professional career; (4) was unrelated to her work performance at the bank; (5) originated from a non-customer of NPB; and (6) most importantly, was false.

89.     Ms. Trigiani attempted to share these facts with Mr. Asbury and inform him that he was asking inappropriate and irrelevant questions about her personal life, but he informed her that he did not wish to hear it.

90.     Ultimately, Mr. Asbury chose not to terminate Ms. Trigiani at this time.

91.     Two weeks later, Mr. Asbury informed Ms. Trigiani that "we are okay," leaving Ms. Trigiani to believe he had changed his mind and that her employment and position/role were secure.

**Ms. Trigiani received an unwarranted negative performance review**

92.     In early April of 2019, Ms. Trigiani received her first – and only – written work performance evaluation in 21 months of employment.  The evaluation was drafted by Mr. Asbury.

93.     In her evaluation, two "Goals" listed seemingly referred to Ms. Trigiani's job duties.  Interestingly, these "Goals" were never articulated to Ms. Trigiani verbally prior to their inclusion in her review.

94.     With respect to the first "Goal," which required Ms. Trigiani to "institute agile performance around market analytics, universal messaging and content, and market presence," Ms. Trigiani was rated as "meets standards."

95.     For her only other "Goal" within the evaluation, Ms. Trigiani was tasked to

"develop project management to assist management in successfully accomplishing each [space left blank on evaluation]." Again, as to this "Goal", Ms. Trigiani was rated as "meets standards."

96. However, further within her evaluation, significant text was entered by Mr. Asbury under the heading "Competencies."

97. Mr. Asbury wrote that Ms. Trigiani "exhibited unacceptable behavior and counterproductive behavior", but Mr. Asbury did not describe a single incident of such alleged behavior.

98. The evaluation also provided that if Ms. Trigiani did not improve in her behavior at NPB, "then termination will ensue due to the severity of the implications these weaknesses are causing."

99. Additionally, during a four-hour meeting over Ms. Trigiani's work performance review, in the presence of employee Mr. Keys, Mr. Asbury told Ms. Trigiani that she had no banking experience, and that this was "a problem."

100. Ms. Trigiani reminded Mr. Asbury that she had brought up this very point during hiring conversations in May 2017 and the response at that time was, "it's exactly why we want to hire you – for your management expertise and strategic experience." Therefore, the stated issue from Mr. Asbury lacked credibility.

101. Further, with respect to banking experience, NPB had multiple opportunities to send Ms. Trigiani to training at the Virginia Bankers Association ("VBA") Indeed, upon information and belief, NPB sent four to six employees to the VBA training every year, but Ms. Trigiani was not provided with this opportunity.

102. Mr. Asbury insisted that Ms. Trigiani prepare her response to his review within two days after receiving her evaluation, despite her high workload.

16

103.    Even so, Ms. Trigiani drafted a highly detailed response and strategy plan moving forward.

104.    Despite her valid, reasoned, and measured points, Mr. Asbury and Mr. Keys all but ignored this response.

105.    Ms. Trigiani was instead advised that she was under probation at this time and that any step deemed inappropriate by Mr. Asbury or any negative report he received would be grounds for her termination.

106.    Ms. Trigiani considered this probationary period to be utterly unwarranted and not based on legitimate expectations of the bank.

107.    Mr. Keys subsequently told Ms. Trigiani that she should not worry about the review – he was not sure it was even submitted into her file – that Mr. Asbury was "just trying to get [her] attention".

108.    Ms. Trigiani felt traumatized due to these empty threats designed to intimidate her, to keep her in a constant state of fear, and to attempt to force her resignation.

**Mr. Keys admitted that Mr. Asbury attempted to
induce Ms. Trigiani's resignation, then refused to
engage with Ms. Trigiani about legitimate workplace issues**

109.    In May of 2019, Mr. Keys again informed Ms. Trigiani not to worry, that she was no longer under probation, and that her position was secure. He also stated that Mr. Asbury did not want to do the work Ms. Trigiani was doing, that he felt she was good at it, and that they "liked" her.

110.    On several occasions, Mr. Keys indicated to Ms. Trigiani that Mr. Asbury had not liked the way Ms. Trigiani was bringing problems to his attention, and Mr. Keys would then usually share an anecdote about how he "handled" his wife when she started

bringing up issues at home.

111.    Mr. Keys also indicated that for a time, Mr. Asbury was trying to get Ms. Trigiani to resign, but that was no longer the case.

112.    Mr. Keys would not answer Ms. Trigiani's questions about whether the review and her response had been entered into her permanent record.

113.    Mr. Keys also would not respond to her regular requests to discuss her compensation or her questions about whether he had reviewed her personnel file.

114.    Additionally, during a reorganization process in June and July of 2019, Mr. Keys confirmed to Ms. Trigiani on three occasions that she would continue to do the strategic planning for the bank.

115.    However, when the new organization charts were circulated, strategic planning had been moved under Mr. Boczar without official notification to Ms. Trigiani, which further marginalized her position at NPB and cut her off from work opportunities.

116.    Also, throughout the summer of 2019, in light of Mr. Asbury's assertions that she now needed banking experience, Ms. Trigiani requested training opportunities, but Mr. Keys was nonresponsive, while other employees who shared Mr. Asbury's religious views were regularly sent to training and conferences.

Upon Mr. Keys' requests for Ms. Trigiani to take on additional work with Mr. Asbury that was not in her position description, Ms. Trigiani also expressed to Mr. Keys that she had been and continued to feel traumatized by how she had been treated by Mr. Asbury and others in the bank's employ.

**Follow the Cult Leader:**
**Ms. Trigiani was informed that that Mr. Asbury was NPB's "pastor",**
**that she must "follow the pastor", and was later**
**publicly snubbed by her co-workers at a business community event**

117.   In May of 2019, as an example of the oppressive faith-based cult environment, NPB senior vice president Linda Lowe informed Ms. Trigiani that "Todd [Asbury] is pastor of our bank, and you need to follow the pastor."

118.   This ideation of Mr. Asbury as a religious leader within the very structure of NPB's chain of command, was a common theme throughout Ms. Trigiani's employment.

119.   Though his title was CEO, Mr. Asbury's role was akin to a religious pastor while on shift at NPB.

120.   In June of 2019, Ms. Trigiani was directed to work remotely from home by Mr. Keys, who said, "I want you to be out of this environment, so they'll leave you alone." Ms. Trigiani assumed this was due to the discriminatory animus NPB leadership possessed against women and non-evangelicals.

121.   In late August of 2019, Ms. Trigiani attended a meeting of a local chamber of commerce. She was surprised to learn that, despite having attempted to organize the bank's participation in the luncheon and having received no response to an email to Mr. Keys, that at a luncheon associated with the meeting, NPB leadership had secured a table, filled it with NPB executives, but did not include or otherwise invite Ms. Trigiani, despite NPB knowing of her attendance at the meeting.  She, in fact, was required to arrange seating at another table.

122.   Ms. Trigiani professionally asked Mr. Keys why she was not informed of their attendance.

123.   In response, Mr. Keys stated, "I don't have to tell you everything."

124.    Then, in an insulting, and childish, gesture, Mr. Keys proceeded to stick his tongue out at Ms. Trigiani, in a way that was visible to the entire table and business leaders in attendance at the event.

125.    This entire situation was embarrassing and harmful to Ms. Trigiani's professional reputation in the community, and in the banking and business industries.

### NPB pretextually terminated Ms. Trigiani's employment

126.    Throughout 2019, Mr. Keys had discussed with Ms. Trigiani an impending reduction in force ("RIF").

127.    Each time the topic arose, Ms. Trigiani would ask Mr. Keys if she needed to prepare. He always responded that her position was secure.

128.    Mr. Keys then called Ms. Trigiani on or about September 18, 2019, and asked that she meet with him on September 19, 2019.

129.    When Ms. Trigiani inquired as to the purpose of the meeting, he said that he and Chief Credit Officer Bill Beard had to "run something by" her.

130.    During the meeting, however, Ms. Trigiani was informed that her position would be eliminated that day, September 19, 2019.

131.    At the time, Ms. Trigiani was led to believe that NPB was terminating the employment of a significant group of personnel. However, NPB failed to provide any information related to the other employees affected by the RIF to Ms. Trigiani.

132.    Indeed, although Ms. Trigiani inquired as to the nature of other positions being eliminated, NPB failed to provide statutorily required disclosures regarding the RIF, rendering it impossible for Ms. Trigiani to weigh whether her age or sex or religion played a part in the reduction.

133.    Additionally, while Mr. Keys indicated that the only people who knew of Ms.

Trigiani's termination were Mr. Asbury's direct reports and Ms. Trigiani's former assistant, word was "on the street" by late afternoon, and it became quickly, and widely, known at NPB and within the community that Ms. Trigiani had been terminated from employment.

134.   As an example, another NPB employee restricted Ms. Trigiani's access to the bank's social media pages before Ms. Trigiani learned of her own termination.

135.   Upon information and belief, Ms. Trigiani's workplace responsibilities were taken over by younger and/or male employees that adhered to the same evangelical religious beliefs as Ms. Trigiani's NPB supervisors.

136.   At the time of her unlawful termination from employment, Ms. Trigiani was protected from sex, religious, and age discrimination by Title VII and the ADEA.

137.   Upon information and belief, NPB's decision-making with regard to Ms. Trigiani's termination was not based upon any neutral, legitimate business reasons, but was merely a pretext to unlawful sex and/or age and/or religious discrimination, as Ms. Trigiani's termination occurred under circumstances that raise a reasonable inference of unlawful discrimination, and is indicative of NPB's discriminatory bias against its older, female employees and/or those who hold non-evangelical, or otherwise dissimilar, religious beliefs.

138.   Indeed, upon information and belief, statistical data will support that, subsequent to Ms. Trigiani's termination from employment, multiple terminations from employment have occurred, almost all targeting employees over the age of forty (40).

139.   NPB engaged in a pattern and practice of discrimination that fostered a work environment charged with discrimination and hostile to Ms. Trigiani and other Title VII and ADEA-protected employees, and would not have terminated Ms. Trigiani's

employment, nor taken the other discriminatory actions against her, but for Ms. Trigiani's sex, age, and/or non-evangelical religious beliefs.

140. Any reasons cited by NPB for its decisions with regard to Ms. Trigiani and others were pretextual.

141. Due to the acts and omissions of NPB, Ms. Trigiani was discriminated against in violation of the Title VII and the ADEA.

142. Because the actions taken against Ms. Trigiani were taken by supervisory employees at NPB within the scope of their employment, NPB is responsible for their actions based upon the doctrine of *respondeat superior*.

## COUNT I: CLAIM OF SEX-BASED HARASSMENT/ HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

143. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

144. Plaintiff is female and is protected by Title VII from harassment and a work environment that is both hostile and accepting of sex-based harassment.

145. During her employment with Defendant, Plaintiff personally was subjected to unwelcome behavior based upon her sex that was sufficiently severe and pervasive so as to alter the conditions of her employment, create an abusive atmosphere, and unreasonably interfere with Plaintiff's work performance.

146. At all times material hereto, Defendant had an obligation to maintain a work environment that was not charged with discrimination and hostile to Plaintiff and other female employees.

147. Defendant violated federal law by creating and permitting a work environment to exist that was discriminatory, hostile, and offensive to Plaintiff and other

females, and by terminating Plaintiff's employment.

148.    At all times relevant, Defendant retained substantial control over the context in which the discriminatory conduct and harassment occurred, and had actual knowledge of Plaintiff's supervisors' hostile and harassing behavior.

149.    The conduct previously detailed was unwelcome, humiliating, unlawful, and based on Plaintiff's sex, as evinced by the poor treatment and harassment Plaintiff encountered during her employment with Defendant.

150.    But-for Plaintiff's sex, she would not have been the victim of discrimination.

151.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

152.    At all times material hereto, Defendant engaged in a practice or practices supporting a hostile work environment with malice or reckless indifference to the federally protected rights of Plaintiff so as to support an award of liquidated and/or punitive damages.

153.    The above-described acts by Defendant and employees of Defendant constitute sex-based harassment and a hostile work environment in violation Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, as codified under 42 U.S.C. §§2000e, *et seq*. ("Title VII").

154.    Plaintiff is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT II: CLAIM FOR SEX DISCRIMINATION IN VIOLATION OF TITLE VII

155.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

156.     Plaintiff is a female, and protected from sex discrimination by Title VII.

157.     At all times material hereto, Defendant had an obligation to maintain a work environment that was not charged with discrimination, and hostile to Plaintiff and other female employees.

158.     Defendant violated federal law by creating and permitting a work environment to exist that was discriminatory to Plaintiff and other female employees, and by wrongfully terminating Plaintiff's employment.

159.     Specifically, Defendant discriminated against Plaintiff by treating her differently from, and less favorably than, similarly situated male employees, subjecting her to other differential treatment on the basis of her sex, and terminating Plaintiff's employment, all in violation of Title VII.

160.     Defendant would not have terminated Plaintiff's employment, nor taken the other discriminatory actions against her, but for Plaintiff's sex.  Alternatively, Plaintiff's sex was a motivating factor in Defendant's actions.

161.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

162.     Prior to Plaintiff's termination from employment, Plaintiff was performing her work at a satisfactory level and meeting or exceeding Defendant's legitimate business expectations.

163.     At all times material hereto, Defendant engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Plaintiff so as to support an award of liquidated and/or punitive damages.

164.    Any reasons cited by Defendant for Plaintiff's termination were pretextual as Plaintiff's work performance was meeting legitimate business expectations.

165.    The above-described acts by Defendant and employees of Defendant constitute sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

166.    Plaintiff is entitled to all reasonable costs, including attorneys' fees, associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

### COUNT III: CLAIM FOR RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII

167.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

168.    Plaintiff, who does not identify her religion as evangelical or Pentecostal, is protected from religious discrimination by Title VII.

169.    At all times material hereto, Defendant had an obligation to maintain a work environment that was not charged with religious discrimination, and hostile to Plaintiff and other non-evangelical employees.

170.    Defendant violated federal law by creating and permitting a work environment to exist that was discriminatory to Plaintiff and other non-evangelical employees, and by wrongfully terminating Plaintiff's employment.

171.    Specifically, Defendant discriminated against Plaintiff by treating her differently from, and less favorably than, similarly situated evangelical employees, subjecting her to other differential and discriminatory treatment on the basis of her non-evangelical religious beliefs, and terminating Plaintiff's employment, all in violation of Title VII.

172.   Defendant would not have terminated Plaintiff's employment, nor taken the other discriminatory actions against her, but for Plaintiff's non-evangelical religious beliefs.  Alternatively, Plaintiff's non-evangelical religious beliefs were a motivating factor in Defendant's actions.

173.   As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

174.   At all times material hereto, Defendant engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Plaintiff so as to support an award of liquidated and/or punitive damages.

175.   Prior to Plaintiff's termination, Plaintiff was performing her work at a satisfactory level and meeting or exceeding Defendant's legitimate business expectations.

176.   Any reasons cited by Defendant for Plaintiff's termination were pretextual as Plaintiff's work performance was meeting legitimate business expectations.

177.   The above-described acts by Defendant and employees of Defendant constitute religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII").

178.   Plaintiff is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT IV:  CLAIM FOR DISCRIMINATION IN VIOLATION OF THE ADEA

179.   Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

180.   At the time of her termination from employment, Plaintiff was sixty-one (61) years of age, and protected from age discrimination by the ADEA.

26

181.    Prior to Plaintiff's termination from employment, she was performing her work at a satisfactory level and meeting the legitimate business expectations of Defendant.

182.    During her employment with Defendant, Plaintiff experienced unwelcome discrimination based upon her age, and was treated differently, and less preferably than younger employees, subjected to other discriminatory and differential treatment on the basis of her age, and ultimately was terminated from employment, all in violation of the ADEA.

183.    Defendant's conduct towards Plaintiff was discriminatory and intentional, and no business-related legitimate reason justified the actions taken against her, as prior to Plaintiff's termination from employment, she was performing her work at a satisfactory level.

184.    Defendant would not have terminated Plaintiff's employment, nor taken the other discriminatory actions against her, but for Plaintiff's age.

185.    Any reasons cited by Defendant for Plaintiff's termination from employment were pretextual, as Plaintiff's work performance was meeting Defendant's legitimate business expectations.

186.    Upon information and belief, after Plaintiff's termination, her job duties were taken over by one or more employees of Defendant, all of whom are younger than Plaintiff.

187.    In addition, Defendant cited a reduction in force (RIF) as the reason for Plaintiff's position being eliminated. However, Ms. Trigiani did not receive disclosures, as required by the Older Workers Benefit Protection Act, as it amended the ADEA. Accordingly, Defendant is in de facto violation of the ADEA.

188.   In addition, Ms. Trigiani's claims of age discrimination are supported by statistical data from Defendant's recent terminations from employment, almost all of whom were over the age of forty (40).

189.   As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

190.   At all times material hereto, Defendant engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Plaintiff so as to support an award of liquidated damages.

191.   The above-described acts by Defendant and employees of Defendant constitute age discrimination in violation of the Age Discrimination in Employment Act, as codified under Title 29 U.S.C. §§ 621 through 634 ("ADEA").

## COUNT V: CLAIM FOR INTERSECTIONAL DISCRIMINATION: SEX, RELIGIOUS, AND AGE DISCRIMINATION

192.   Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

193.   The actions of Defendant as described herein constitute intersectional discrimination based upon age in violation of the ADEA, and based upon sex and religion in violation of Title VII.

194.   As a direct result, Plaintiff has suffered and will continue to suffer loss of income and damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

195.   Defendant acted willfully and with actual malice or with reckless disregard of the law in terminating Plaintiff's employment and depriving Plaintiff of income because

28

the intersection of her age, sex, and religion so as to support an award of liquidated and punitive damages.

WHEREFORE, Plaintiff Mary Yolanda Trigiani prays for judgment against Defendant New Peoples Bank, Inc., and for lost wages and benefits, equitable relief, compensatory, punitive, and/or liquidated damages, together with prejudgment interest from the date of Ms. Trigiani did not receive an adequate pay increase as detailed in the complaint and/or Ms. Trigiani's termination from employment, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

**_Trial by jury is demanded on all issues on which Plaintiff is entitled to a trial by jury, including any question concerning whether Plaintiff's claims must be submitted to arbitration._**

Respectfully Submitted,

**MARY YOLANDA TRIGIANI**

_/s/ Thomas E. Strelka_
Thomas E. Strelka, Esq. (VSB # 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
Brittany M. Haddox, Esq. (VSB # 86416)
Monica L. Mroz, Esq. (VSB # 65766)
N. Winston West, IV, Esq. (VSB # 92598)
STRELKA EMPLOYMENT LAW
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA  24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
brittany@strelkalaw.com
monica@strelkalaw.com
winston@strelkalaw.com

_Counsel for Plaintiff_

29