## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **MARY YOLANDA TRIGIANI,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:21CV00001 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **NEW PEOPLES BANK, INC,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendant. | ) | |

*Thomas E. Strelka, L. Leigh R. Strelka, and N. Winston West, IV, STRELKA EMPLOYMENT LAW, Roanoke, Virginia, for Plaintiff; Charles G. Meyer, III, and Mary Grace Miller, O'HAGAN MEYER, PLLC, Richmond, Virginia, for Defendant.*

In this employment case, the plaintiff asserts claims against her former employer under Title VII of the Civil Rights Act of 1964 for sex and religious discrimination. The plaintiff alleges that she was terminated from her position as an executive with a financial institution because she was "a strong-willed woman" and because she was of the Catholic faith. The defendant employer has moved for summary judgment, contending that the plaintiff was chosen to be terminated in a reduction-in-force because of her high salary and performance issues. For the reasons that follow, and following briefing and oral argument, I will grant the motion.

I.

The following facts are taken from the summary judgment record.

The plaintiff, Mary Yolanda Trigiani, is a former employee of the defendant, New Peoples Bank, Inc. (Bank), a regional financial institution located in Central Appalachia.[1]   In July 2017, she was hired as the Senior Vice President (SVP) of Strategic Planning and Development.   She had previously worked for the Bank as a consultant since June of 2016, assisting with business development and marketing. While Trigiani did not have prior banking experience, she had significant experience in marketing, business development, and strategic planning and had previously owned and operated a business consulting firm that she founded in 1990.

It was the Bank's CEO and President Todd Asbury's decision to hire Trigiani. Asbury has served in that role since 2014, after the Board of Directors hired him to oversee and stabilize the Bank's struggling financial situation following the 2008 recession, which left it saddled with over $40 million in troubled loans.   Asbury embarked on a campaign of fiscal austerity to eliminate underperforming departments and to reduce headcount.   Trigiani disputes that at the time of her termination in 2019, the Bank was in difficult financial straits, since it had recently opened a new office in Bristol, Virginia.   The Bank claims, however, that the office

---

[1]   The Bank reports that it has 20 offices in southwestern Virginia, southern West Virginia, northeastern Tennessee, and western North Carolina.   New Peoples Bank, *Locations & Hours,* https://www.newpeoples.bank/locations (last visited Apr. 19, 2022).

was an investment to establish a greater presence in that particular community.  It also provided financial statements that show it did not report positive earnings until August of 2021.

Asbury recruited Trigiani to assist the Bank with its rebranding efforts to help grow the business.  He created the SVP of Strategic Planning and Development role specifically for her; no other individuals were considered for the position.  The Board approved the position with a $100,000 annual salary.  Asbury wanted the Bank to expand its foothold in southwest Virginia and to become more community oriented, and he directed Trigiani to lead this outreach effort, implementing a strategic plan and supporting internal and external communications, particularly social media. Notably, her role was not directly focused on generating revenue.

As the President and CEO, Asbury strongly embraced cultivating a workplace culture of compassion and empathy.  One of the Bank's core values is "Golden Rule Banking," which asks every employee to treat others with the same kindness and respect they would expect to receive themselves.  It became part of the Bank's strategic plan and was integrated into all of its marketing materials.  Asbury testified that the Bank follows the Golden Rule because it is a "good common practice. It's good relationships. That's what banking's about is relationships."  Pl.'s Br. Opp'n Ex. 2, Asbury Dep. 44–45, ECF No. 46-2.  However, Asbury, who is also the pastor

at a local Protestant evangelical church, recognized that the tenet has a religious aspect. *Id.* at 45.

In her new role, Trigiani reported directly to Asbury. She contends that her working environment deteriorated soon after she started with the Bank. She testified that she had received pushback from colleagues, particularly men in senior leadership roles, whenever she had advocated for change or asserted herself in meetings. She claims that it is because the Bank's culture is infused with gender and religious bias, that she was reviled as a strong woman who did not share the Bank's evangelical worldview of subservient women. It is undisputed, however, that numerous employees, both women and men, made complaints about Trigiani to Human Resources Director Lori Counts and to Asbury. Asbury testified that he had received the first complaint only one month after Trigiani started at the Bank. The complaints detailed a similar pattern of misconduct regarding how Trigiani treated and communicated with her colleagues. Specifically, the complainants alleged that she would yell or raise her voice, that she would speak in a disrespectful and belittling tone, that she would slam her door, and that she frequently bullied employees, some to the point of tears.

For example, in July of 2018, Dorothy Meade emailed Trigiani to tell her that on a recent call, she "came across as being a little harsh and demanding." Def.'s Mem. Supp. Ex. F, Counts Decl. Ex. D at 21, ECF No. 40-6. Meade included on her

email a copy of a recent company-wide note from Asbury, reminding all employees about the Bank's "Golden Rule Banking" ethos.  Meade told Trigiani that she was "not accustomed to being talked to that way and will not tolerate it," and that she was a "team player" who "treat[ed] co-workers with respect."  *Id.*

Meade forwarded the email exchange to her supervisor, Andy Mullins, and another senior executive, J.W. Kiser.  Mullins responded that Trigiani had "ticked off half of [his] staff," while Kiser remarked that her behavior was "getting old" and questioned "[h]ow many people must be victim of her tongue before she either gets reprimanded or goes home."  *Id.* at Ex. Q, ECF No. 40-17.  Kiser further stated that he had "no desire to be a team member of someone who has been so disrespectful to so many."  *Id.*

Kiser also complained to Asbury that Trigiani attacked his character following a disagreement over her proposed plan to require supervisory approval for marketing expenses.  He strongly opposed the measure because he wanted his employees to be able to approve low-level expenses without his sign-off.  Kiser testified that Trigiani has said that his "ego wouldn't allow her plan to work and that she knew that she was supposed to bow down to [him] because commercial made all the money at the bank."  *Id.* at Ex. S, Kiser Dep. 17, ECF No. 40-19.  Trigiani denies that she commented on his ego but said Kiser simply "didn't like [her] process because [she]

-5-

was a woman" that was "[a]sserting [her] responsibility." Pl.'s Br. Opp'n Ex. 1, Trigiani Dep. 138, ECF No. 46-1.

Trigiani's assistant, Beth Dalton, complained to Counts and Asbury about Trigiani's behavior. Trigiani hired Dalton in March of 2018 after Asbury had recommended her. She contends that Asbury pressured her into hiring Dalton because she was a parishioner at his church. Trigiani testified that they had a cordial and friendly relationship and that she was unaware of any workplace issues. Dalton testified that Trigiani would often "lose her temper" and that she would raise her voice, while "pacing and stomping the floor." *Id*. at Ex. 6, Dalton Dep. 24, 48, ECF No. 46-6. In September, Dalton sent Counts a list of the workplace incidents involving Trigiani that she had experienced over the past six months; she reported that she was "in tears almost every day and [became] physically sick." Counts Decl. ¶ 17, ECF No. 40-6. A few months later, Emily Fulkerson-Murphy, a marketing assistant who worked for Trigiani, came to Counts' office crying and said that Trigiani would "explode over small things" and that she heard her yelling through the walls at others on the phone. *Id.* ¶ 19. HR Director Counts claims that she never received more complaints about a single employee in her 15 years at the Bank. There were complaints from at least 10 different employees about Trigiani's conduct, often multiple times.

Trigiani does not dispute that complaints were made about her, including that Asbury counseled her about them on a nearly quarterly basis. She does, however, contend that Asbury never informed her of specifics and that she lacked notice of the particular conduct that upset her colleagues. She claims that Asbury made only vague statements, such as, "you know what you did." Asbury Dep. 74–75, ECF No. 46-2. Trigiani also complained to Asbury that others, including Counts, were "throwing the Golden Rule at her," *Id.* at 71. She disputes that she ever slammed the door or yelled at anyone; rather, her voice is "very loud to begin with" and her office door had a "weak hinge[]" that would make it slam even if she only "tap[ped] it." Trigiani Dep. 99–100, ECF No. 46-1.

Asbury's concerns regarding Trigiani's workplace issues nonetheless reached a critical point in December 2018, and he met with Trigiani about them. He testified that "[t]here was too much of the continual having to deal with . . . continual complaints, [him] telling her what's going on." Asbury Dep. 115, ECF No. 46-2. He claimed that during the meeting, she "was being loud in [his] office and yelling," when he told her that she could just leave the Bank and that he had already directed Counts to draft a separation agreement. Trigiani asked to remain in her position, and Asbury ultimately backed off of his threat to terminate her.

In early 2019, Trigiani was moved to be under the direct supervision of Gary Keys. A few months later, in April, Trigiani met with Asbury and Keys to discuss

her performance review for 2018.  This was her first and only performance review.

The Bank's performance ratings assigned scores 1–5, with 1 being the highest rating,

or "exceptional," and 5 being the lowest, or "unacceptable."  She received a Final

Performance Rating of 3.05, or just slightly below "meets standards."  Def.'s Mem.

Supp. Ex. Z at 7, ECF No. 40-26.  She received strong ratings for her decision-

making skills and the quality of her work product, among other things, and Asbury

praised Trigiani as possessing "great skills and talents" — that she had "great

potential to be a superstar."  *Id.* at 8.  On the other hand, Asbury recognized with

"all of this drive and determination, she has run into interpersonal problems in the

bank that have created unhealthly tension and lack of cooperation that has created

disruptions."  *Id.*  Under "Interpersonal Effectiveness," Trigiani was rated a 5, or

"Unacceptable," and under "Leads Change" and "Communication," Trigiani was

rated a 4, or "Not Fully Meet[ing] Standards."  *Id.* at 4–5, 7. Asbury explained that

Trigiani

> struggles in this [interpersonal effectiveness] area with certain people
> internally and has exhibited unacceptable behavior and counterproductive
> behavior. I believe she is working on improving this but when things don't go
> as planned then the behavior repeats. . . . I have coached her and she works
> toward what is instructed but still has setbacks from time to time. . . . This
> area must improve and exhibit sustained improvements immediately.

*Id.* at 4.

Asbury further noted that if she did not fix these issues that "termination will

ensue due to the severity of the implications these weaknesses are causing."  *Id.* at

8. It was agreed that her performance would be revaluated every 30 days over the next 90 days to assess improvement, namely correcting her 4s and 5s to sustained 3s, but Asbury expressed his "full confidence that [Trigiani] can do this within the allotted time frame." *Id.* Trigiani formally responded on April 5 that she understood that her "behavior has been unacceptable and counterproductive," but protested that Asbury's invitation that any employees who had concerns should speak with him or Counts would encouraged complaints about her. Pl's Br. Opp'n. Ex. 18 at 5, ECF No. 46-18.

In May 2019, Asbury directed the Bank's managers to identify positions for a reduction-in-force (RIF). Although the Bank's financial situation had been improving, it still had a goal of reducing headcount by hiring "only to replace;" and "combin[ing] current positions where feasible." Def.'s Mem. Supp. Ex. AA at 2, ECF No. 40-27. The Bank had set a specific target goal of "245 headcount by 2020." *Id.* at 3. The criteria for selecting positions for the RIF included the cost of the position as well as employee performance and conduct. Keys did not identify or suggest that Trigiani's position be included in the RIF. Rather, Asbury made that decision on his own, with consultation and input from the Board. Scott White, a Board member, testified that Trigiani's position was selected for economic reasons, and that the Board had told Asbury that it was "a position that [they] didn't need. . . . It felt like that [position] was more of a luxury." *Id.* at Ex. BB, White Dep. 19, ECF

No. 40-28.  White said, "It didn't have really anything to do with who was in that position, and it was a position we did not have . . . a year or so before, and it was just one we didn't feel like we could afford."  *Id.*  Asbury testified that he eliminated her position because of "behavioral issues and performance tied into that," and that he "couldn't see the economic benefit."  Asbury Dep. 111, ECF No. 46-2.

In June 2019, Counts sent an email, notifying employees of the positions that had been selected for elimination.  Including Trigiani's position, the Bank eliminated ten total positions — nine of them were women.  Trigiani's position was officially eliminated in September 2019.  Eight months later, the Bank laid off an additional 30 employees, including four senior male executives who had been with the Bank for 21 years, 14 years, 7 years, and 3 years, respectively.  By the end of 2020, the Bank had reduced its headcount by nearly 50 percent.

## II.

Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the

parties. *Celotex Corp. v. Catrett ex rel. Catrett*, 477 U.S. 317, 322 (1986).[2]  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  A fact is material if "its existence or non-existence could result in a different jury verdict." *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At the summary judgment stage, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to come forward and establish a specific material fact in dispute.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  In determining if a genuine issue of material fact exists, courts view the facts and draw all reasonable inferences in favor of the nonmovant.  *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

---

[2]  I have omitted internal quotation marks, citations, and alterations throughout this opinion unless otherwise noted.

judge." *Anderson*, 477 U.S. at 255.   However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (unpublished).

III.

A.  Count II – Sex Discrimination.

Trigiani's first claim is that the defendant discriminated against her on the basis of her sex.[3]  Title VII prohibits an employer from discharging or refusing to hire an individual "because of" such individual's sex.  42 U.S.C. § 2000e-2(a)(1). Because Trigiani does not have any direct evidence of discrimination, the parties proceed under the well-established *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). First, a plaintiff must establish her prima facie case.  *Id.* at 802.  The burden then shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the adverse action.  *Id.*  Finally, the burden shifts back to the employee to demonstrate that the asserted justification is pretextual.  *Id.* at 803–05.

To establish a prima facie case for sex discrimination in a RIF context, where performance is the announced basis for selection, a plaintiff must show that: (1) she

---

[3] The plaintiff alleged in her Complaint, but has now withdrawn claims for gender hostile work environment (Count I) and age discrimination (Count IV).

is a member of a protected class; (2) her position was selected for elimination; (3) she was performing at a level substantially equivalent to the lowest level of that in the group that was retained; and (4) the process of selection produced a residual workforce that contained some unprotected persons who were performing at a level lower than at which the plaintiff was performing. *Corti v. Storage Tech. Corp*., 304 F.3d 336, 340 n.6 (4th Cir. 2002).[4]

The Bank does not dispute that Trigiani can establish the first and second prongs — as a woman, she is a member of a protected class and her position was eliminated in the RIF. However, it argues that Trigiani has failed to show that she was meeting the Bank's legitimate expectations or that individuals who were less qualified were retained. Even if she could establish her prima facie case, the Bank contends that Trigiani has failed to show that its legitimate, non-discriminatory justification was pretextual. I will assume, without deciding, that Trigiani has produced evidence sufficient to establish her prima facie case of discrimination. Nevertheless, I find that the Bank has proffered ample evidence of legitimate, nondiscriminatory reason for eliminating Trigiani's position, namely, a RIF.

---

[4] The Bank contends that the *Corti* framework applies. The plaintiff cites only to *Blistein v. St. John's College*, 74 F.3d 1459 (4th Cir. 1996), *overruled in part on other grounds*, *Adams v. Moore Business Forms, Inc.*, 224 F.3d 324 (4th Cir. 2000), an age discrimination case that did not involve a RIF where selection was based on performance. I find that *Corti* sets forth the most applicable standard given the facts of this case.

The Fourth Circuit has recognized that there is no inference of discrimination when an employer adheres to neutral, established policies and procedures for a RIF. *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002). "[I]t is within the employer's purview, in implementing a RIF, to analyze its employees' performance and determine, without utilizing any protected characteristic, who must be terminated." *Marshall v. AT&T Mobility Servs., LLC*, No. 3:17-CV-1577-CMC, 2019 WL 1274723, at *4 (D.S.C. Mar. 20, 2019), *aff'd*, 811 F. App'x 849 (4th Cir. 2020) (unpublished); *see also Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000) ("The decision to discharge [the plaintiff] and retain [others] is the kind of business decision that we are reluctant to second-guess."). When assessing job performance, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996).

The Bank has met its burden to show that it conducted the RIF to reduce headcount and debt, and that it based its selection criteria on cost and job performance — both valid, non-discriminatory bases. Since 2011, the Bank has implemented a strategy to reduce headcount, both by attrition and RIFs in 2011, 2014, 2019, and 2020. In 2008, the Bank had 371 employees; by the end of 2020, it had only 189 employees. The Bank still did not report positive earnings until 2021. It has also shown that the plaintiff's position qualified under both selection criteria:

she received a high salary and that the numerous complaints about interpersonal conflicts and bullying behavior negatively impacted her performance.

Once a defendant has discharged its burden, "the *McDonnell Douglas* framework — with its presumptions and burdens — disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43 (2000). "[A] plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Holland v. Wash. Homes, Inc.*, 487 F.3d 209, 214 (4th Cir. 2007). In other words, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995). Unfortunately for the plaintiff, she has not put forth sufficient evidence to meet her pretext burden.

Trigiani argues that her inclusion in the RIF was pretext for discrimination because her work performance was satisfactory and the Bank has offered changing explanations. Neither claim is supported by the evidence. Furthermore, she contends that the language used to criticize her is infused with gendered stereotypes, namely that she "need[ed] to behave," that her tone was "harsh" and "demanding," and that she was "vindictive." Asbury Dep. 81, 132, ECF No. 46-2; Counts Decl. Ex. D at 21, ECF No. 40-6. In other words, she did not behave in a sufficiently

feminine way around the office. This argument is also not supported by the evidence.

First, Trigiani's claim that she was meeting her employer's expectations is based primarily on her 2018 performance review and her supervisor's deposition testimony. An employee may point to evidence that that she was performing at a level that met her employer's legitimate expectations to prove that her employer is lying about its proffered justification. *Volochayev v. Sebelius*, 513 F. App'x 348, 353 (4th Cir. 2013) (unpublished). "Such a showing of satisfactory performance does not require the plaintiff to show that he was a perfect or model employee." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). However, the employer has discretion to determine its own legitimate expectations for its employees. *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) ("It is the perception of the decision maker which is relevant."). It is not for the court to "decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.,* 133 F.3d 293, 299 (4th Cir. 1998).

The 2018 performance review is not proof that Trigiani was meeting the Bank's legitimate expectations. To the contrary, it is undisputed that she received an overall rating slightly below "meet standards," and that she was rated "unacceptable" in interpersonal effectiveness and "does not fully meet standards" in

communications.  It was also made explicitly clear that failure to address these performance issues could result in termination.  She even acknowledged in her response to the performance evaluation that others viewed her behavior as unacceptable and counterproductive.  Her supervisor, Gary Keys, testified that she was "good, she worked hard," but he acknowledged that "quite a few people" informed him that she was "hard to get along with."  Pl.'s Br. Opp'n Ex. 11, Keys Dep. 18, 23, ECF No. 46-11.

Trigiani argues that she never received a written complaint, nor was she placed on a performance improvement plan, even though the Bank followed a progressive disciplinary policy.  In other words, if her performance was truly unsatisfactory, then surely the Bank would be able to produce a paper trail to support that conclusion.  This, of course, misses the mark.  It is the plaintiff's burden to create an inference that the defendant's reason is pretext for discrimination.  *Dugan*, 293 F.3d at 722.  In any event, the problem with this argument is that it ignores the fact that there *is* a paper trail, one that is comprised of contemporaneous and consistent complaints about her mistreatment of others.  Trigiani even admitted that she was aware of these complaints.  While she disputes that her conduct was always accurately depicted and further claims that she lacked knowledge of specifics, she was certainly aware the issues concerned her communications style, as evidenced by the performance review and email from Dorothy Meade.  Whether she had specific

notice of the objectionable behavior is also irrelevant to whether her employer could consider it when deciding to eliminate her position.

Second, Trigiani claims that the defendant's reasons for her termination have changed over time or are inconsistent, and that the defendant did not follow its procedures for selecting her position. A plaintiff can demonstrate pretext where "an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes*, 922 F.3d at 225. However, her "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons" for inclusion in a RIF. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989). "Even if there is evidence that the [defendant] erroneously or even purposely misapplied the RIF policy, it is not proof of unlawful discrimination." *Dugan*, 293 F.3d at 722.

Here, the fact that Asbury, not Keys, selected Trigiani's position for elimination is not smoking-gun evidence of discrimination. Asbury, as the CEO and President, oversees all employees, and he also directly supervised Trigiani until early 2019. There is also no other evidence in the record that suggests the RIF did not otherwise comport with the Bank's normal procedures. Trigiani further points to White's deposition testimony, where he stated that the Board eliminated her position for economic reasons. She argues that this contradicts Asbury's deposition testimony, where he stated that her position was eliminated because of job

performance. It is claimed that these reasons are mutually exclusive — that is, they cannot both be true and the contradiction exposes the defendant's attempt to manufacture a non-discriminatory basis for eliminating her position after the fact.

I disagree. A RIF by definition is based on economic reasons. Put differently, a business that is doing well financially does not ordinarily direct a company-wide reduction in its workforce. An employer, of course, has the discretion to decide the selection criteria, and here, the Bank considered two factors: cost of the position and the employee's conduct and job performance. According to White, the Board viewed her position as a luxury and it did not matter who was in that role, whereas Asbury attested that the Bank could not justify keeping her position because of the workplace performance issues and her high salary. There is nothing inherently contradictory about these two explanations. To be sure, Asbury's description is more specific, as he focused on the second basis for elimination, but that does not necessarily mean it conflicts with the first basis. He also testified that regarding her position, he "couldn't see the economic benefit," which is consistent with White's testimony. Asbury Dep. 111, ECF No. 46-2.

This approach is in accordance with the Fourth Circuit's decision in *Haynes*, which the plaintiff mistakenly relies on to advance the contrary conclusion. There, the court held that the plaintiff had shown pretext where the defendant's reasons "changed substantially" over time. 922 F.3d at 226. First, they told him he was fired

for "job abandonment," but later they claimed it was because of his "poor attitude." But the court was careful to explain that "an employer is certainly permitted to expand on its original reason." *Id.* If anything, the Bank merely expanded on its original reason (the RIF) by emphasizing the job performance issues that qualified her for inclusion, but its reason never substantially changed. The contradiction posited by the plaintiff simply does not exist and her own speculation that the defendant's reasons were manufactured, absent evidentiary support, cannot support an inference of pretext.

Finally, the plaintiff contends that the real reason she was terminated is because she is a strong woman — that is, she is a "bold . . . [l]oud-speaking, emphatic person and that does not jive with their definition of femininity and female executiveness." Trigiani Dep. 109, ECF No. 46-1. The Supreme Court has recognized that gender stereotyping may give rise to a claim of sex discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989) (noting that "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22" that is prohibited by Title VII). However, the particular language objected to here does not contain an indication or even strong inference that impermissible stereotypes about female executives underpin these complaints. No one complained, for example, that Trigiani was a strong woman. Rather, she was accused of yelling and raising her

voice, slamming her door, and belittling her colleagues and making them cry. Trigiani disputes the severity of her behavior, but even she admitted that such conduct would be inappropriate in the workplace, regardless of gender. Trigiani Dep. 112, 168, ECF No. 46-1. Her claim that male executives behaved similarly but were not subjected to the same type or number of complaints also lacks any evidentiary support.

In any event, Asbury testified that he hired Trigiani because she was a strong, successful woman, without considering any other candidates. The "fact that the employee was hired and fired by the same person within a relatively short time span . . . creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). The Fourth Circuit has previously applied this so-called same-actor inference in the Title VII context, *Evans*, 80 F.3d at 959, and where the time span between an employee's hiring and firing was two years, *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 211, 214–15 (4th Cir. 1994).

In sum, even if the plaintiff could make out a prima facie case, she has put forth no contrary explanation, supported by evidence, that creates a genuine issue of material fact as to whether the defendant's reason is pretextual. The Bank therefore is entitled to summary judgment on the sex discrimination claim.

B. COUNT III – RELIGIOUS DISCRIMINATION.

Trigiani's second claim is that the defendant discriminated against her on the basis of religion — namely, that she was a non-evangelical Catholic.  As with her sex discrimination claim, she proceeds under the *McDonnell Douglas* burden-shifting framework.  To establish a prima facie case of religious discrimination where the plaintiff does not share her supervisor's religious beliefs, many courts have adopted a modified framework that requires a plaintiff to show: (1) she was subjected to an adverse employment action; (2) her job performance was satisfactory; and (3) some additional evidence to support an inference that the adverse action was taken because of a discriminatory motive.  *Scott v. Montgomery Cnty. School Bd.*, 963 F. Supp. 2d 544, 553 (W.D. Va. 2013) (citing *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1037–38 (10th Cir. 1993)).  I find that this framework is appropriate, but her religious discrimination claim still must fail.  Simply put, the plaintiff has not introduced any evidence showing that she was terminated because of her religion, and therefore summary judgment for the defendant is appropriate.

Trigiani's claim rests on the fact that she is a non-evangelical Catholic, whereas Asbury is an evangelical Protestant, and that the Bank's "Golden Rule Banking" principle was "weaponized" against her.  However, in her deposition testimony, Trigiani agreed that no one had ever said anything disparaging about her

Catholicism, and when asked if she believed that Catholics could not succeed at the Bank, she replied, "absolutely not."   Trigiani Dep. 304, ECF No. 46-1.   It is undisputed that Asbury is a pastor at a local evangelical church and that he strictly adheres to his faith, as do other employees at the Bank, such as Trigiani's former assistant, Beth Dalton.   But that alone does not create an inference of discrimination. Asbury also hired Trigiani knowing she was a Catholic.   Therefore, the same-actor inference, as discussed above, similarly applies to rebut her religious discrimination claim.  *Proud*, 945 F.2d at 798.   In addition, several Board members who approved Trigiani's hiring and firing, as well as several of the employees who made complaints, such as Emily Fulkerson-Murphy, are also Catholic.

Finally, the plaintiff contends that the "Golden Rule Banking" principle was somehow a  cause of her dismissal.   While the Golden Rule may be popularity associated with Christianity,[5] it is not unique to any particular religious or ethical doctrine.[6]  Trigiani herself testified that she views the principle as divorced from its religious origins — that is, it is "so much in the public lexicon" that "in [her] mind, [it was] not an indication of religious adherence."   Trigiani Dep. 234, ECF No. 46-

---

[5]  "Therefore all things whatsoever ye would that men should do to you, do ye even so to them:  for this is the law and the prophets."  *Matthew* 7:12 (King James Version).

[6]   The principle is found in in the writings of Confucius, Plato, and Aristotle. *Golden Rule*, britannica.com, https://www.britannica.com/topic/Golden-Rule (last visited Apr. 19, 2022).

1.  As she explained, "the Golden Rule is universally understood, and it's no longer even attached to Christianity."  *Id.* at 235.   There is no evidence that the Bank's adherence to this ethos had anything to do with her Catholicism or her termination.

### C.  COUNT V – INTERSECTIONAL DISCRIMINATION.

Trigiani also asserts a claim for intersectional discrimination based on sex and religion.  Courts have explained that "intersectional" discrimination theory applies to plaintiffs who have been discriminated against because of two or more protected characteristics.  *Brown v. OMO Group, Inc.*, No. 9:14-cv-02841-DCN, 2017 WL 1148743, at *5 (D.S.C. Mar. 28, 2017).  The Fourth Circuit has not recognized an intersectional theory of discrimination.  In any event, I find that the Bank is entitled to summary judgment on this theory because Trigiani has failed to prove both her sex and religion discrimination claims.

\* \* \*

In her Complaint, the plaintiff makes eye-popping allegations, such as the following:

> Mr. Asbury . . . encouraged a cult-like office culture by opposing individualistic thinking/ideas, penalizing or ostracizing employees who did not follow to the letter certain cultural-religious tenets (such as the subjugation of women), expecting a slavish devotion to the NPB Cult, avoiding what he considered to be worldly/contemporary activities, and rewarding blind allegiance.
> . . . .
>        . . . Ms. Trigiani soon recognized the office NPB culture for what it was:  a religious-based group which requires its followers to submit

-24-

themselves entirely to its leaders/teachers and which uses manipulative techniques to persuade and control its members.  In other words, the "NPB Cult."

Compl. ¶¶ 18, 24, ECF No. 1.  While over-the-top allegations are unfortunately not unusual in initial pleadings, the time for reckoning often comes, as it does in this case.  The plaintiff here is essentially her only witness and her subjective conclusions about her own conduct and the resulting treatment by her employer do not overcome the undisputed facts.

IV.

For the foregoing reasons, it is **ORDERED** that the Motion for Summary Judgment, ECF No. 39, is GRANTED.  A separate judgment pursuant to Federal Rule of Civil Procedure 58(a) will be entered herewith.

ENTER:   April 20, 2022

/s/  JAMES P. JONES
Senior United States District Judge